02-10-133-CV REH









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00133-CV

 

 


 
 
 National Western Life Insurance Company
 
 
  
 
 
 APPELLANT AND
 APPELLEE
 
 
 
 
  
 V.
  
 
 
 
 
 Sheila Newman
 
 
  
 
 
 APPELLEE AND
 APPELLANT
 
 


 

 

----------

 

FROM THE 415th
District Court OF Parker COUNTY

----------

 

MEMORANDUM
OPINION ON REHEARING[1]

----------

 

We
have considered Appellee Sheila Newman’s motion for rehearing.  We deny the
motion but withdraw our August 11, 2011 opinion and judgment and substitute the
following.

Appellant
National Western Life Insurance Company (National Western) appeals the trial
court’s judgment against it for the fraudulent acts of its agent, Lynn
Strickland, Jr., upon appellee Shelia Newman.  Newman filed a cross-appeal,
however, for ease of reading, we will refer to National Western as the
appellant and Newman as the appellee.  We will reverse the trial court’s
judgment and render judgment that Newman take nothing.

I.  Background
Facts

          In
late 2005, Newman decided to invest a large amount of her savings.  She was
uneducated in investing so she researched companies online and chose to
purchase an annuity from National Western because “[i]t was a reputable company
that had been in business for many years.”  Newman called National Western, who
told her an agent would contact her.

Soon
after, Strickland called Newman and made an appointment to speak with her at
her home.  Strickland told Newman that if she invested $200,000, she could live
off the interest received.  He also told her that if she invested that amount,
she would receive a $20,000 bonus.  Strickland gave Newman a business card with
his phone number and told her to call him when she had decided whether to
invest.

In November
2005, Newman phoned Strickland and agreed to the $200,000 amount.  Strickland told
her to get two cashier’s checks, one for $75,000 and another for $125,000.  He
also told Newman to make both checks out to Lone Star Financial “in order for
him to be able to handle the money.”  Lone Star Financial is owned by
Strickland.  In January 2006, Strickland went to Newman’s house, where he gave her
a two-page application for the annuity.  The first page contained a section for
Newman’s personal information, which she filled out.  The first page also
contained blanks for identifying the type of plan, the beneficiary, and a blank
for the amount of money submitted with the application.  Newman left the amount
blank because Strickland “was in a hurry that day . . . and [she] trusted that
he would take care of it.”  At the bottom of the first page was the following statement:

I have read the
statements above and to the best of my knowledge and belief they are true and
correct.  Any statement made by either the agent of this application or by any
other person shall not be binding on [National Western] unless such statement
is reduced to writing by [National Western] and made a part of the annuity
contract.  I have received and read a copy of the annuity information brochure
and understand the features of the plan of insurance applied for.

Below
that, Newman and Strickland signed the application.  The back page of the
application contained only one short section entitled “Agent’s Section,” where
Strickland signed, and under that, in bold, the statement, “***ALL CHECKS MUST
BE PAYABLE TO NATIONAL WESTERN LIFE INSURANCE COMPANY***.”  Strickland was also
supposed to give Newman a document titled “Consumer Disclosure Signatures.” 
That document contained the statement, “If you have any questions after you
receive your annuity Policy, please contact your agent or call National
Western’s Customer Service Department at 1-800-922-9422.  We want to be
sure that you read all 10 pages of this Disclosure and are aware of the benefits
and features explained herein.”  Newman’s initials were next to the
statement that the policy had been explained to her, and Newman’s and
Strickland’s signatures were under the statement that she had received a copy
of the Disclosure and had reviewed it with her agent.  Newman testified at
trial that she did not recall ever seeing the disclosure and that her signature
on it was forged.

Strickland
later deposited the $75,000 check into Lone Star Financial’s account.  Strickland
filled out the amount section of Newman’s application for $125,000 and endorsed
the $125,000 check over to National Western.  National Western, in turn, issued
Newman a policy in the amount of $125,000.  National Western sent Strickland a
copy of the insurance policy for him to hand-deliver to Newman.

Between
January 2006 and December 2007, Newman drew on the annuity a number of times.  She
also received checks from National Western, some that she received in the mail
and some that she claims were hand-delivered by Strickland, although they were all
addressed to her.  Newman claims she never received an annual statement or
interest statement, although they were also sent to her home address.  Newman testified
she tried for several years to get a copy of her policy from Strickland, but he
would give her excuses and cancel appointments.  When she threatened to go to
National Western, he told her not to call the company directly because “they
would not have the information and it would be confusing.”

Finally
in December 2007, Newman complained to National Western that she never received
a copy of her $200,000 policy.  National Western told Newman that her policy
was only for $125,000.  National Western contacted Strickland about Newman’s
complaint.  He responded that “the amount of the annuity Mrs. Newman bought was
for [$]125,000.  I talk to Mrs. Newman about 2 or 3 times a month[.]  She never
complained about anything . . . .”  Strickland provided National Western with a
copy of the delivery receipt, purportedly signed by Newman, stating that she
had received the copy of her policy on February 6, 2006.  At trial, Newman
denied receiving the copy National Western sent in 2006 and claimed her
signature on the receipt was forged.  National Western sent Newman a letter
reaffirming receipt of only the $125,000 check, and provided her a copy of the
check and another copy of her policy.  After Newman’s complaint that she did
not receive her policy, National Western terminated Strickland’s contract.  Newman
demanded that National Western reimburse her $200,000.  National Western
refused.

Newman
filed suit against Strickland and National Western.  After striking Strickland’s
answer as sanctions for failing to appear at scheduled depositions, the trial
court rendered judgment against Strickland, awarding Newman treble damages
under the Deceptive Trade Practices Act.  See Tex. Bus. & Com. Code Ann. §§ 17.46,
50 (West 2011).  The case against National Western proceeded to a jury trial.

After
hearing the evidence, the jury made the following relevant findings:

(1)   Strickland had
authority to act for National Western.

 

(2)   Strickland
knowingly engaged in false, misleading, unfair, or deceptive acts or practices
that Newman relied on to her detriment.

 

(3)   Strickland
committed fraud against Newman.

 

(4)   Strickland
was not an independent contractor.

 

(5)   National
Western had the right to control Strickland with respect to Strickland’s
fraudulent acts.

 

(6)   National
Western ratified Strickland’s conduct.

 

(7)   Newman’s damage
resulted from gross negligence attributable to National Western.

The
jury awarded actual damages of $112,736.49 ($200,000 plus a $20,000 bonus less
the amount Newman withdrew on the policy).  At the bifurcated punitive damages
phase, the jury found clear and convincing evidence that Newman’s damages “resulted
from gross negligence” and awarded Newman $150,000,000 in punitive damages.  Newman
elected to recover for fraud, and the trial court entered judgment on the
verdict for the actual damages awarded and prejudgment interest, attorney’s
fees, and the punitive damages found by the jury.

          National
Western filed both a motion for judgment non obstante veredicto and a motion
for new trial. The trial court refused to rule on each of these motions.  This
appeal followed.

II.  Discussion

A.  Jury Question One

All
of Newman’s claims against National Western were predicated on its position
that Strickland was acting within the scope of authority that binds National
Western.  Our analysis of National Western’s issues is complicated by the trial
court’s submission of Jury Question One: 

Did Lynn Strickland,
Jr. have the authority to act for National Western Insurance Company?

 

Actual authority for another to act
for a party must arise from the party’s agreement that the other act on behalf
and for the benefit of the party to act on behalf of [National Western].  If a
party so authorizes another to perform an act, that other party is also
authorized to do whatever else is proper, usual, and necessary to perform the
act expressly authorized.

 

Apparent authority exists if a party
(1) knowingly permits another to hold himself out as having authority to act on
behalf of another, in this case, [National Western] or, (2) through lack of
ordinary care, bestows on another such indications of authority that lead a
reasonably prudent person to rely on the apparent existence of authority to act
on behalf of [National Western] to his detriment.   Only the acts of the party
sought to be charged with responsibility for the conduct of another may be
considered in determining whether apparent authority of another to act for the
party exists.  When a person has notice of the limitations of an actor’s
authority, then that such person cannot detrimentally rely on the apparent
existence of the authority of the actor to act for the party.

 

National
Western objected to this question:

Judge, we object to
Jury Question No. 1.  The defendant believes that this particular question, the
way it’s phrased, applies to only the general grant of authority given an agent
in the normal course of his business in which it carries out those implied
duties and in-kind things as authorized.

 

We believe that it
needs to include specific acts such as “deposited the money into his account
for his own use.”  Otherwise, if we do not—if we word it this way, what will
happen is—the practical effect is we will stand up and say—and they will as
well—that the contract between the agent and National Western let him solicit
the contract and collect monies.

 

When
you do that, they’re going to jump up and say “We win automatically almost as a
matter of law because he can do those things.”  But he couldn’t take the money
for his own use which is what this case is about.  So what we’ll have to argue
to the jury is “Wait a minute, it says here you have the authority to act for
us.  But wait a minute.  You’re saying he wasn’t authorized to take the money for
his own use.”  That’s incongruent with what is in this question.

          Newman
contends that National Western’s objections at trial to Jury Question One were
confusing and limited only to apparent authority.  As a result, Newman argues
National Western did not properly preserve its complaint concerning Jury Question
One as an issue for appeal.  However, the above-quoted objections contain no
such limitation.

          The
real question before us is not whether there was a proper objection to the
charge; instead, the question is what is the import of the jury’s answer to
that question.  The fact that Strickland had authority to act for National
Western was never in doubt.  National Western and Strickland had a contract
that specifically authorized Strickland to procure applications and collect
monies on behalf of National Western.  Jury Question One is immaterial to any
element of Newman’s causes of action, and the jury’s answer lends nothing to
establish liability on the part of National Western.  The question fails to
assist Newman in establishing National Western’s liability because it fails to
connect any authority Strickland had to the injury-producing acts that the jury
found Strickland to have committed.  See Gaines v. Kelly, 235 S.W.3d
179, 184 (Tex. 2007) (“The relevant issue . . . is not merely the existence of
an agency relationship, but rather the scope of that agency.”).  Jury Question
One and its answer cannot be considered as contributing anything to the basis
of this judgment or the outcome of this appeal.

          National
Western claims throughout its argument on appeal that there is no evidence to
support any finding that it authorized Strickland’s misdeeds, controlled his
fraudulent actions, or ratified his conduct after the fact.  Despite our conclusion
that the submission of Jury Question One serves no useful purpose, we will address
National Western’s legal sufficiency challenge to the questions contained in
the court’s charge that are relevant to Newman’s causes of action.

B.    Strickland
had no authority to bind National Western through his fraudulent acts.

 

The
law does not presume agency.  Tex. Cityview Care Ctr., L.P. v. Fryer,
227 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, pet. dism’d).  The party
alleging agency has the burden to prove its existence.  Id.  An agent
must have the authority (either actual or apparent) to bind the principal.  Id. 
Thus, absent a showing that Strickland had the authority to bind National
Western through his actions, or a showing that National Western ratified
Strickland’s conduct after the fact, National Western cannot be liable for
Strickland’s fraud.

An
agent’s authority to act on behalf of a principal depends on some communication
by the principal either to the agent (actual or express authority) or to the
third party (apparent or implied authority).  Gaines, 235 S.W.3d at 182. 
Actual authority is authority that the principal intentionally confers upon the
agent, or intentionally allows the agent to believe he has, or by want of
ordinary care allows the agent to believe himself to possess.  Tex. Cityview
Care Ctr., 227 S.W.3d at 352.  Apparent authority is based on estoppel,
arising either from a principal knowingly permitting an agent to hold himself
out as having authority or by a principal’s actions which lack such ordinary
care as to clothe the agent with the indicia of authority, thus leading a
reasonably prudent person to believe that the agent has the authority he
purports to exercise.  Gaines, 235 S.W.3d at 182.

1.  Actual
authority

          We
first address Newman’s argument that National Western did not preserve error as
to actual authority.  A no-evidence point is preserved through any one of the
following:  (1) a motion for instructed verdict; (2) a motion for judgment
notwithstanding the verdict; (3) an objection to the submission of the issue to
the jury; (4) a motion to disregard the jury’s answer to a vital fact issue; or
(5) a motion for new trial.  T.O. Stanley Boot Co., Inc. v. Bank of El Paso,
847 S.W.2d 218, 220 (Tex. 1992).  National Western filed a motion for directed
verdict on the issue of actual authority, a motion for new trial, and a motion
for judgment notwithstanding the verdict.  Even if National Western did not
preserve error by properly objecting to the jury charge as Newman claims, it
has sufficiently preserved its issue of actual authority for our review.

          In
its first issue, National Western argues that there is no evidence to support
the jury’s finding that Strickland had the authority to act for National
Western when he committed fraud.  We may sustain a legal sufficiency challenge
only when (1) the record discloses a complete absence of evidence of a vital
fact; (2) the court is barred by rules of law or of evidence from giving weight
to the only evidence offered to prove a vital fact; (3) the evidence offered to
prove a vital fact is no more than a mere scintilla; or (4) the evidence
establishes conclusively the opposite of a vital fact.  Uniroyal Goodrich
Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied,
526 U.S. 1040 (1999); Robert W. Calvert, “No Evidence” and “Insufficient
Evidence” Points of Error, 38 Tex. L. Rev. 361, 362–63 (1960).  In
determining whether there is legally sufficient evidence to support the finding
under review, we must consider evidence favorable to the finding if a
reasonable factfinder could and disregard evidence contrary to the finding
unless a reasonable factfinder could not.  Cent. Ready Mix Concrete Co. v.
Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).

The
jury made an affirmative finding that Strickland had the authority to act for National
Western.  As stated above, the contract between Strickland and National Western
established that Strickland did have authority to act for National Western. 
Specifically, he had the authority to “procure applications for insurance and
annuity contracts” by virtue of his contract with National Western.[2] 
This, however, is not sufficient to establish liability for Strickland’s
fraud.  That is, the mere fact that Strickland had some authority to act
for National Western does not establish that Strickland’s fraud was within the
scope of that authority.  See Gaines, 235 S.W.3d at 184 (“The relevant
issue then is not merely the existence of an agency relationship, but rather
the scope of that agency.”).  The same contract which established Strickland’s
authority also explicitly limited that authority to what was “expressly stated
in [the] contract” and specifically forbade Strickland from, among other
things, “perpetrat[ing] any fraud against [National Western], our policyholders,
prospective policyholders or applicants.”  The contract explicitly stated that
all monies collected by Strickland belonging to National Western would be held
in a fiduciary trust, not used for any personal purpose, and would be
immediately paid to the principal.  In other words, Strickland’s actual
authority did not extend beyond procuring contracts for National Western and
accepting payment to be sent to National Western.

          Newman
argues that Strickland’s fraudulent acts were incidental to his authorized
duties, and thus should be attributable to National Western.  As the supreme
court has said, “In determining a principal’s vicarious liability, the proper
question is not whether the principal authorized the specific wrongful act; if
that were the case, principals would seldom be liable for their agents’
misconduct.”  Celtic Life Ins. Co. v. Coats, 885 S.W.2d 96, 99 (Tex.
1994).  Therefore, the proper test for actual authority is whether the agent’s
acts were within the course and scope of his agency.  Id.; Lyon v.
Allsup’s Convenience Stores, Inc., 997 S.W.2d 345, 347 (Tex. App.—Fort
Worth 1999, no pet.).  “If an employee deviates from the performance of his
duties for his own purposes, the employer is not responsible for what occurs
during that deviation.”  Lyon, 997 S.W.2d at 347 (holding that employee’s
defamation and intentional infliction of emotional distress were deviations
from employee’s duties and were not done in the furtherance of employer’s
business); see also Gaines, 235 S.W.3d at 185 (“Because an agent’s
authority is presumed to be co-extensive with the business entrusted to his
care, it includes only those contracts and acts incidental to the management of
the particular business with which he is entrusted.”).  For an employee’s acts
to be within the scope of employment, the conduct must be of the same general
nature as that authorized or incidental to the conduct authorized.  Minyard
Food Stores, Inc. v. Goodman, 80 S.W.3d 573, 579 (Tex. 2002) (holding that
employer was not liable for employee’s defamation of other employee because it
was not furthering employer’s business or accomplishing a purpose of employee’s
job); Millan v. Dean Witter Reynolds, Inc., 90 S.W.3d 760, 767–68 (Tex.
App.—San Antonio 2002, pet. denied) (holding that investment company was not
vicariously liable for broker’s embezzlement from client that in no way related
to his authorized duties and, thus, greatly exceeded the scope of his
authority); Lyon, 997 S.W.2d at 347.  In cases involving serious
criminal activity, an employer is not liable for intentional and malicious acts
that are unforeseeable considering the employee’s duties.  Millan, 90
S.W.3d at 768.

In a
postsubmission letter brief, Newman relies on Coats for her proposition
that liability attaches because National Western authorized Strickland to make
representations on its behalf.  But the facts of Coats are not analogous
to the present case.  In Coats, the agent of the insurance company
misrepresented the benefits of the insurance policy he sold.  885 S.W.2d at
97.  The jury found that that the agent had authority to explain, on the
company’s behalf, the benefits of the policy.  Id. at 99 (“The
misrepresentation . . . was made in the course of explaining the terms of the
policy—a task the jury specifically found to be within the scope of Harrell’s
authority.”).  The jury also found that the agent did not make the
misrepresentations knowingly.  Id.  The agent in Coats was within
the scope of his authority at the time of the injury-producing act and
furthered the purpose of his agency.  Here, Strickland’s misconduct took place
outside the authority granted him by National Western.  He did not exceed his
authority when he described the terms of the annuity policy.  Unlike the agent
in Coats, he could have delivered exactly what he promised.  Strickland’s
wrongful acts did not further his principal’s business.

Other
cases provide more guidance.  In Morrow v. Daniel, 367 S.W.2d 715, 718
(Tex. App.—Dallas 1963, no writ), the court held that although the agent was
acting within the scope of his employment when he fraudulently induced the
plaintiff into purchasing stock in the principal’s company, he was not acting
as an agent when he told the principal that the plaintiff was not purchasing
stock, gave plaintiff forged stock certificates, and used the plaintiff’s money
for his own purposes.  In the first act of fraud (inducing the plaintiff to
purchase stock), the agent’s acts were in the furtherance of the principal’s
business—namely, selling stock and funding the corporation.  The second act of
fraud, however, was fraud on the principal as well as the plaintiff.  Id.
at 716.

          Similarly,
in Millan, the agent was a broker whose authority permitted him to “open
[brokerage] accounts for clients, receive deposits to these accounts, and purchase
and sell securities as directed by clients.”  90 S.W.3d at 768.  The agent took
deposits made by his client (who was also his mother), deposited them into a
fictitious account, withdrew on that account, and stole his client’s statements
to hide his fraud.  Id. at 763.  The court of appeals in that case held
that the agent’s fraudulent acts were not in the scope of his authority and
were not related to his duties.  Id. at 768.

Like
the agents in Morrow and Millan, Strickland was authorized to
accept payment from the principal’s customers.  And like the agents in Morrow
and Millan, Strickland was not authorized to retain the funds he
received for his personal use.  Nor could Strickland’s acts be considered to be
in furtherance of National Western’s business or accomplishing his job because
National Western was deprived of the money which Strickland retained.  There is
a distinction between defrauding a customer to reap a benefit for the principal
and defrauding a customer to reap a benefit for oneself.  Compare Coats,
885 S.W.2d at 99 (holding that agent’s misrepresentation was made in the course
of his authorized duty to secure policies for his principal) with Minyard
Food Stores, 80 S.W.3d at 579 (employee’s defamation of coworker during
investigation, in which he was required to participate, did not further
employer’s business or accomplish the purpose of his job).  When Strickland
deviated from his duty to accept payment on behalf of National Western, he did
so solely for his own personal gain.

          Newman
notes that the jury found in two questions that Strickland was not an
independent contractor and that National Western retained the right to control
Strickland’s actions.  However, the scope of Strickland’s authority is set
forth in his contract with National Western.  “A contract expressly providing
that a person is an independent contractor is determinative of the relationship
absent evidence that the contract is a mere sham or subterfuge designed to conceal
the true legal status of the parties or that the contract has been modified by
a subsequent agreement between the parties.”  Farlow v. Harris Methodist
Fort Worth Hosp., 284 S.W.3d 903, 911 (Tex. App.—Fort Worth 2009, pet.
denied) (citing Newspapers, Inc. v. Love, 380 S.W.2d 582, 588–90,
592 (Tex. 1964)).  Newman does not point to any evidence to support the jury’s findings,
or to support any finding that the contract between National Western and
Strickland was a sham designed to conceal the true status of the parties to the
contract or that the contract had been subsequently modified.  To the contrary,
Newman testified that Strickland informed her that he was an independent
contractor.  She further testified that at the time she signed the contract, she
understood that statement on the application which said that Strickland’s
statements were not binding on National Western until reduced to writing by
National Western in the annuity policy.

Further,
Newman does not claim that National Western retained the right to control how
Strickland procured applications or accepted payments.  Instead, Newman focuses
on the fact that National Western’s referral procedure resulted in Strickland being
sent to Newman’s home.  The referral to Newman’s home was not, however, the
injury-producing event.  See Exxon Corp. v. Tidwell, 867 S.W.2d 19, 23
(Tex. 1993) (noting that in determining whether duty exists in retained control
cases, focus is on whether retained control was specifically related to the alleged
injury).  Had Strickland performed his duties consistent with his contract
after being referred to and meeting with Newman, there would have been no
fraud.  An entity’s liability must arise from its own injury-causing conduct.  Id. 
The injury-producing event occurred when Strickland convinced Newman to write
two checks to his company instead of National Western; sign an application with
critical information (i.e., the amount of the policy) left blank; and
not to contact National Western with her concerns.  Because National Western did
not retain control over those aspects of Strickland’s job that led to Newman’s
injury, liability cannot be based on the right to control.  We therefore hold
that there is no evidence to support the jury’s findings that Strickland was
not an independent contractor and that National Western retained the right to
control.  The evidence conclusively establishes the opposite:  Strickland was
an independent contractor and National Western did not retain the right to
control Strickland’s fraudulent acts.  See Newspapers, Inc., 380 S.W.2d
at 592 (“When . . . the parties . . . have entered into a definite
contract that expressly provides for an independent contract relationship and
does not vest in the principal . . . the right to control the details of the
work, evidence outside the contract must be produced to show that despite the
terms of the primary contract the true operating agreement was one which vested
the right of control in the alleged master.”).

          Newman
points to evidence that National Western was aware of previous bad conduct by
Strickland and chose to continue to employ him.  Newman argues that by
retaining Strickland as an agent after receiving complaints against him,
National Western, by lack of ordinary care and despite the language of his
contract, allowed Strickland to believe that he had the authority to request
checks from customers made out to his own companies so that he could retain
those funds for his own personal use and delay the delivery of contracts to
conceal his wrongdoing.

The
evidence presented at trial included four customer complaint files, only two of
which contained complaints prior to Newman’s dealings with Strickland.  A
customer complained in 2003 that he had not received copies of his policies. 
National Western investigated the complaint and refunded the customer’s
contributions.  In 2005, another customer complained that Strickland had
retained about $10,000 of her money and had told her to write a check to
“Estate Services of Texas,” which the customer claimed was owned by Strickland. 
Strickland insisted that he had written her a check for the funds, wrote a new
check for the amount, and claimed no knowledge of any check written to Estate
Services of Texas.  The customer then withdrew her complaint.

Even
assuming these complaints are evidence that Strickland had retained money and
withheld policies in the past, they are not evidence that National Western
allowed Strickland to believe that he had the authority to retain checks from
customers made out to his own companies or to delay the delivery of contracts. 
Nor are they evidence of Strickland’s subjective belief that he had the
authority to do so.  See Austin Area Teachers Fed. Credit Union v. First
City Bank-N.W. Hills, N.A., 825 S.W.2d 795, 799 (Tex. App.—Austin 1992,
writ denied) (considering testimony that the agent believed that his action was
authorized in holding that implied authority existed).  The complaint files
show that National Western investigated all complaints and that Strickland
attempted to conceal any misconduct that may have occurred by telling National
Western that he had not done the complained-of acts.  While there is evidence
that National Western was aware of Strickland’s practice of requesting checks
in the name of his own company, there is no evidence that National Western
acquiesced to any practice Strickland may have had of retaining the funds.  Nor
are the files evidence that National Western retained the right to control
Strickland’s actions despite the contractual language.  See Farlow, 284
S.W.3d at 911 (noting that the exercise of control that must occur so as to
convert an independent contractor to an employee “must be so persistent and the
acquiescence therein so pronounced as to raise an inference that at the time of
the act or omission giving rise to liability, the parties by implied consent
and acquiescence had agreed that the principal might have the right to control
the details of the work”) (quoting Newspapers, Inc., 380 S.W.2d at 592).

There
is no evidence that National Western intentionally conferred, or intentionally
allowed Strickland to believe, or by want of ordinary care allowed Strickland
to believe that he possessed the authority to defraud National Western clients
or the company itself.  See Gaines, 235 S.W.3d at 182 (holding
that agent had actual authority to deliver and explain loan documents but did
not have actual authority to negotiate terms of the loans); Morrow, 367
S.W.2d at 719 (holding that agent had authority to sell stock and accept
payment but did not have authority to retain the funds he received).  Nor were
Strickland’s acts in furtherance of his duties as an agent of National
Western.  Because there is no evidence of actual authority, we next turn to
apparent authority.

2.  Apparent
authority

The
principal’s full knowledge of all material facts is essential to establish a
claim of apparent authority.  Gaines, 235 S.W.3d at 182.  Only the
conduct of the principal is relevant.  Id.; see also Zarzana v.
Ashley, 218 S.W.3d 152, 161 (Tex. App.—Houston [14th Dist.] 2007, no pet.)
(“[A]ny of the agent’s representations are wholly irrelevant in determining
apparent authority.”).  The standard is that of a reasonably prudent person,
using diligence and discretion to ascertain the agent’s authority.  Gaines,
235 S.W.3d at 182–83.

Apparent
authority is not available when the other party has notice of the limitations
of the agent’s power.  See Douglass, 504 S.W.2d at 779.  As stated
above, Newman admits that she was aware that Strickland was an independent
contractor.  She also testified that had she read the application, she would
have known that she could not rely on Strickland’s statements.  That
application also stated in bold, capital letters that all checks should be made
out to National Western.  It was incumbent upon Newman to protect herself by
reading what she signed.  In re Lyon Fin. Servs., Inc., 257 S.W.3d 228,
233 (Tex. 2008) (orig. proceeding).  Although fraud may be an excuse to
ignorance of a contract’s terms in some cases, id., the fraud Strickland
committed on Newman was for the amount of the annuity, not the extent of his
agency or ability to bind National Western.  It is notice of the limitations of
his agency that is relevant to the issue of apparent authority.  See
Douglass, 504 S.W.2d at 779.

Further,
there is no evidence that National Western was aware that Newman had given
Strickland a second check for $75,000.  It is undisputed that Newman received
the product that National Western received payments for—a $125,000 annuity.  Newman
testified that she never spoke to anyone at National Western concerning an
amount until after Strickland’s fraud was discovered.  National Western therefore
did not have the full knowledge necessary to establish apparent authority.  National
Western’s acceptance of the $125,000 check endorsed over from Lone Star
Financial is no evidence that it was aware of the second check for $75,000 that
Strickland kept for himself.  By Newman’s own admission, there was no conduct
by National Western that could have reasonably led Newman to believe that
National Western had authorized Strickland’s actions.

To
hold the principal liable, the act of the agent must be done in the furtherance
of the principal’s business and for the accomplishment of the object for which
the agent is employed.  ITT Consumer Fin. Corp. v. Tovar, 932 S.W.2d
147, 158 (Tex. App.—El Paso 1996, writ denied).  When Strickland devised a
scheme to steal money from both Newman and National Western, he far exceeded
his authorized duties and was not acting in furtherance of his employment.  See
Saenz v. Family Sec. Ins. Co. of Am., 786 S.W.2d 110, 111 (Tex. App.—San
Antonio 1990, no writ) (“It is inconceivable that an employee could plan and
execute a fraud upon his employer and be in the furtherance of his employment.”).

To
determine Strickland’s apparent authority, we must examine the conduct of
National Western and the reasonableness of Newman’s assumptions about
Strickland’s authority.  Newman argues that the acts of National Western we
should rely upon to establish apparent authority are that National Western
contracted with Strickland in the first place and “sent him to [Newman’s]
house” to procure an application and accept payment.  This is merely evidence
of the existence of an agency relationship and not of the scope of that
relationship.  Strickland had authority to serve as an intermediary to contact
potential customers, deliver paperwork, explain product terms, and collect
payment.  Newman entirely failed to produce evidence that connected this
authorized conduct and Strickland’s alleged apparent authority to
misappropriate funds from both Newman and National Western.  In her effort to
supply that evidence, her theme was that she trusted National Western because
of their reputation, and they sent Strickland to her home.  All injury-causing
acts or statements were attributed to Strickland and not National Western.  If
this level of proof were sufficient, then an insurance company could do nothing
to avoid liability for the acts of rogue agents who engage in criminal acts
outside the scope of their authority.  Newman’s subjective trust and the fact
that Strickland was an agent referred as a result of her call to National
Western is not sufficient evidence to support a reasonable belief that
Strickland was authorized to convert funds to his personal use to the detriment
of both the principal and its customer.  See Fryer, 227 S.W.3d at
353 (“[A] party dealing with an agent must ascertain both the fact and the
scope of the agent’s authority, and if the party deals with the agent without
having made such a determination, she does so at her own risk.”).

Further,
as we stated above, none of these acts were the cause of Newman’s damages. 
Newman was injured because she followed Strickland’s instructions to write two checks
to Lone Star Financial, sign an incomplete application, and not contact
National Western because they would not have her information.  None of these directions
may be attributable to National Western because there is no evidence that
National Western was aware of them or authorized them.  And Newman, by her own
testimony, did not contact National Western regarding the nondelivery of her
policy.  There is no evidence that National Western was aware that Newman had
not received it, nor was there evidence that Newman ever informed National
Western that the signed delivery receipt it received was a forgery.

There
is, in sum, no evidence of any conduct by National Western that would have reasonably
led Newman to believe that Strickland was authorized to defraud her.  We
therefore hold that the evidence is legally insufficient to support a finding
of vicarious liability through actual or apparent authority.  We sustain
National Western’s first issue.

C.  National
Western did not ratify Strickland’s acts.

          In
its second issue, National Western argues that there is legally and factually
insufficient evidence to support the jury’s finding that National Western
ratified Strickland’s fraudulent acts.  “Ratification may occur when a
principal, though he had no knowledge originally of the unauthorized act of his
agent, retains the benefits of the transaction after acquiring full knowledge.”
 Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc., 609 S.W.2d 754,
756 (Tex. 1980).  Newman argues that because National Western did not return
Newman’s funds after she told them in December 2007, that her annuity should
have been for $200,000, it ratified Strickland’s conduct.

When
Newman contacted National Western in December 2007, she told it that she had
paid its agent $200,000.  In response, National Western contacted Strickland.  Strickland
denied that he had received the additional $75,000 and produced a policy
receipt purportedly signed by Newman.  National Western told Newman that it
believed that she had only applied and paid for a $125,000 policy.  It included
in its letter a copy of the delivery receipt.  There is no evidence in the
record that Newman informed National Western that the receipt was a forgery or
otherwise spoke to National Western again until she had retained counsel.

National
Western had in front of it an application for a $125,000 annuity signed by
Newman, a check for $125,000 signed by Newman, a receipt of the policy it
believed was signed by Newman, multiple withdrawal requests on the policy
signed by Newman, and two years without any complaint by Newman that she had
not received her policy or her statements.  In light of the information it had,
we cannot say it was unreasonable for National Western to believe that Newman
had contracted for, paid for, and accepted a $125,000 annuity, not a $200,000 policy
as she later claimed.  Nor can we say that this was enough information to rise
to the level of the “full knowledge” required to establish ratification.  See
Gibson v. Bostick Roofing & Sheet Metal, Co., 148 S.W.3d 482, 492 (Tex.
App.—El Paso 2004, no pet.) (holding that principal did not ratify conduct of
purported agent when he investigated the plaintiff’s complaint of nonpayment,
the agent told the principal that “he would take care of the payment,” and the principal
was never informed of the agent’s fraud).  There is no evidence that National
Western was aware of the $75,000 check until Newman sent it to them, and after
that, there was no evidence that National Western knew that Newman had made the
check to Lone Star Financial in order to procure a contract with National
Western.  There is no evidence that National Western knew that Newman had
signed the application with the annuity amount blank and that Strickland had
filled it in later.  There is no evidence that National Western knew that the
policy receipt was a forgery, that Newman had not received her policy
statements, or that it should have known she had not received them when they
had evidence that she had received checks delivered to the same address.

The
critical factors in discerning whether a principal has ratified an unauthorized
act by his agent is the extent of the principal’s knowledge of the transaction
and his actions in light of that knowledge.  See Land Title Co. of
Dallas, 609 S.W.2d at 756.  National Western did not have full
knowledge of the material facts of the transaction required to ratify
Strickland’s conduct.  National Western’s refusal to pay Newman $200,000 is not
affirmation of Strickland’s fraud.  In this case, Strickland’s conduct was
fraud on the principal as well as on Newman.  Since the agent’s act is fraud
upon the principal, it is incapable of ratification, because no principal would
confer authority to practice a fraud upon itself.  See Saenz, 786 S.W.2d
at 111; Lincoln Fire Ins. Co. v. Taylor, 81 S.W.2d 1059, 1060 (Tex. App.—Fort
Worth 1935, writ dism’d).

          We
therefore hold that there is no evidence that National Western ratified
Strickland’s fraudulent acts.[3]  We sustain National
Western’s second issue and hold that there is no basis for holding National
Western vicariously liable for Strickland’s fraud.  Because our holdings on
National Western’s first two issues are dispositive, we do not need to reach
the rest of National Western’s issues.  See Tex. R. App. P. 47.1.

D.  Newman cannot recover on her alternate
theories of recovery.

 

Newman argues in her motion for rehearing that she should be
allowed to seek recovery under one of the alternate theories of recovery on
which the jury returned favorable findings.  See Boyce Iron Works, Inc. v.
Sw. Bell Tel. Co., 747 S.W.2d 785, 787 (Tex. 1988).  We first note that it
seems that a judgment rendered in this court is the proper remedy, not remand
to the trial court.  See Transp. Ins. Co. v. Faircloth, 898 S.W.2d 269,
280 (Tex. 1995) (evaluating alternative theories of liability and rendering a
take nothing judgment on all theories submitted to the jury).

The jury returned findings favorable to Newman on whether Strickland
violated the Deceptive Trade Practices Act and whether Strickland
breached a contract with Newman.  However, to hold National Western
liable for those actions necessitates a finding that National Western is vicariously
liable for Strickland’s actions.  See Qantel Bus. Sys., Inc. v. Custom
Controls Co., 761 S.W.2d 302, 305 (Tex. 1988) (noting that “traditional
common law theories of vicarious liability, such as agency or respondeat
superior” provide the only bases for creating vicarious liability under the
DTPA); Sw. Land Title Co. v. Gemini Fin. Co., 752 S.W.2d 5, 8 (Tex.
App.—Dallas 1988, no writ) (holding that there was no evidence of actual or
apparent authority of agent by which to hold principal liable for breach of
contract).  The only jury findings on that issue are in Questions One, Nine,
and Eleven.  Question One, as we stated above, fails to connect any authority
Strickland had to the injury-producing acts that the jury found Strickland to
have committed and does nothing to establish liability on the part of National
Western.  Question Nine asks whether Strickland was an independent contractor. 
We stated above that he was not as a matter of law.  Question Eleven asks
whether National Western ratified Strickland’s conduct.  As we held above, it
did not.  Thus, there is no jury finding by which National Western can be held
vicariously liable for Strickland’s bad acts on any of Newman’s theories of
recovery.  Accordingly, we render judgment that Newman take nothing against
National Western on her alternate theories of recovery.  See Transp. Ins.
Co., 898 S.W.2d at 280 (rendering a take nothing judgment on alternative
theories because there was no evidence to support recovery under any of the
theories); Beal Bank, S.S.B. v. Schleider, 124 S.W.3d 640, 652 (Tex.
App.—Houston [14th Dist.] 2003, pet. denied) (rendering a take nothing judgment
under the plaintiff’s alternative theory of recovery when there was no evidence
to support the jury’s findings on that theory).

E. Newman’s request for sanctions was
properly dismissed.

 

          Newman
filed a postjudgment motion to sanction National Western for allegedly failing
to produce documents in pretrial discovery regarding customer complaints
against Strickland.  During discovery, Newman made the following relevant
requests for production:

Request for
Production No. 20:  A copy of all complaints made by anyone about you to the
Texas Department of Insurance [TDI].

 

. . . .

 

Request for
Production No. 25:  Your complete file on Defendant Lynn Strickland and or Lone
Star Financial.

 

          . . . .

 

Request for
Production No. 28:  Produce all documents surrounding all complaints to you or
the complete complaint file regarding Lynn Strickland or Lone Star Financial.

 

          In
its response to request no. 20, National Western filed multiple objections, including
that “[Newman] is in an equal or superior position to obtain such information
from the public records or available from [TDI] which is more convenient, less
burdensome or less expensive.”  National Western produced documents purporting
to respond to requests nos. 25 and 28.  It later “informally supplemented” its
response with more documents relevant to requests 25 and 28.

          Newman
claims that in January 2010, she learned of a complaint against Strickland that
had not been disclosed by National Western.  She requested files from TDI in
April 2010, and those files included documents which National Western did not
produce during discovery.  She then filed a motion for sanctions against
National Western, requesting that the court require National Western to
“disclose its dishonest conduct” to TDI; strike National Western’s request for
findings of fact and conclusions of law; and grant a monetary sanction of
$75,000.

National
Western filed a response and a plea to the jurisdiction.  After a hearing on
the motion and the plea to the jurisdiction, the trial court dismissed Newman’s
motion for lack of jurisdiction.  In her single issue on appeal, Newman argues
that the trial court incorrectly dismissed her motion for sanctions and erred
in refusing to sanction National Western.

We
review a trial court’s determination whether to impose sanctions under an abuse
of discretion standard.  Am. Flood Research, Inc. v. Jones, 192 S.W.3d
581, 583 (Tex. 2006); Cire v. Cummings, 134 S.W.3d 835, 838 (Tex. 2004).
 To determine whether a trial court abused its discretion, we must decide
whether the trial court acted without reference to any guiding rules or
principles; in other words, we must decide whether the act was arbitrary or
unreasonable.  Low v. Henry, 221 S.W.3d 609, 614 (Tex. 2007);
Cire, 134 S.W.3d 835, 838–39 (Tex. 2004).  An appellate court cannot
conclude that a trial court abused its discretion merely because the appellate
court would have ruled differently in the same circumstances.  E.I. du Pont
de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); see
also Low, 221 S.W.3d at 620.  An abuse of discretion does not occur when
the trial court bases its decisions on conflicting evidence and some evidence
of substantive and probative character supports its decision.  Unifund CCR
Partners v. Villa, 299 S.W.3d 92, 97 (Tex. 2009); Butnaru v. Ford Motor
Co., 84 S.W.3d 198, 211 (Tex. 2002).

Assuming
(without deciding) that the trial court did have jurisdiction to hear Newman’s
motion, we cannot say it erred in failing to sanction National Western. 
National Western demonstrated that it directed Newman to retrieve the documents
from TDI in its response to her request for production.  Newman does not claim
that there are other documents that National Western allegedly withheld that
were not in the documents she received from TDI.  If Newman had contacted TDI
as National Western suggested, she would have received all the documents prior
to trial and would not have suffered any prejudice.  However, Newman chose not
to contact TDI until after trial.  We cannot say that not imposing sanctions
under these facts is unjust.  See Tex. R. Civ. P. 215.2(b) (requiring
the order of sanctions to be just); see also Spohn Hosp. v. Mayer, 104
S.W.3d 878, 882 (Tex. 2003) (holding that a “just” sanction must be directed to
remedying the prejudice caused).  Newman also argued that National Western
should have been sanctioned because Newman filed two motions for sanctions.  We
disagree with Newman’s implicit contention that a court should grant sanctions
against a party solely because a party has repeatedly moved for them.  We
overrule Newman’s sole issue.

Conclusion

Having
sustained National Western’s two dispositive issues and overruled Newman’s sole
issue, we reverse the trial court’s judgment and render judgment that Newman
take nothing.

 

PER CURIAM

 

PANEL: 
GABRIEL, J.; LIVINGSTON,
C.J.; and McCOY, J.

 

DELIVERED:  October 13, 2011









[1]See Tex. R. App. P. 47.4.





[2]Newman argues that
Strickland was a managing general agent of National Western as defined in
chapter 4053 of the insurance code because his contract with the company is
titled “General Agent Manager Contract and Schedule of Commissions.”  See
Tex. Ins. Code Ann. § 4053.001(3) (West 2009) (defining managing general
agent).  A managing general agent may “accept or process on the insurer’s
behalf insurance policies produced and sold by other agents.”  Id. 
Chapter 4053, however, does not apply to “life, health, and accident insurance,
including variable life insurance and variable annuity contracts.”  Id.
§ 4053.003(1) (West 2009).  Any argument Newman makes that chapter 4053
imbued Strickland with the actual authority to defraud is without merit.





[3]To the extent that Newman
argues that National Western ratified Strickland’s conduct by continuing to
employ him, we note that this is not sufficient evidence of ratification.  See,
e.g., Durand v. Moore, 879 S.W.2d 196, 203 (Tex. App.—Houston [14th
Dist.] 1994, no writ) (holding that an employer may not be liable for exemplary
damages under a theory of ratification when the only evidence of ratification
was “[t]he mere retention of an employee”); see also Allen v. Ctr.
Operating Co., L.P., No. CIV.A. 302CV1764P, 2003 WL 22364328, at *8 (N.D.
Tex. Oct. 1, 2003) (relying on Durand in holding that employer did not
ratify employee’s assault by not terminating employee).  Although there was
evidence that National Western had received complaints about Strickland prior
to his dealings with Newman, the evidence was also that those complaints had
been investigated and resolved.  The first complaint was for undelivered
policies and resulted in a full refund by National Western.  The second
complaint was withdrawn “due to a misunderstanding.”  The third complaint
involved Strickland’s deceased partner’s failure to return funds to the policyholder. 
Strickland claimed he was unaware of the failure, and when he was made aware,
he returned the amount to the policyholder.  Retaining Strickland after
investigating these complaints is not evidence that National Western approved
or ratified Strickland’s acts.